IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


MATTHEW MICHAEL KEATING                                                    PLAINTIFF

              v.                        Civil No. 08-5243

SHERIFF TIM HELDER, Washington
County, Arkansas; RANDALL  DENZER, Jail
Administrator, Washington County Detention
Center; CPL. NATHAN MATTHEWS;
DEPUTY COTY STOUT; NURSE SHIRLEY
MOSS; SGT. MISTY CHARLES; SGT.
MICHAEL CAMBRON; SGT. J. FULLER;
SGT. S. BREWER; CPL. T. MUGGY; SGT.
SCHMIDT; DEFENDANT WHITEHOUSE;
CHARLES DOBBS; DEPUTY WILLIAM
HURLEY; DOYLE SHARP; KEVIN EAST;
LT. MASON; BRAD MORGAN; and
CHAD MORGAN                                                                DEFENDANTS


### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Matthew Michael Keating, filed this civil rights action pursuant to 42 U.S.C.

§ 1983.  He proceeds *pro se* and *in forma pauperis*.  Keating's claims arise from his incarceration

at the Washington County Detention Center (WCDC) from June 17,  2008, through January 9,

2009.  Keating was in pretrial status until September 22, 2008.  He remained incarcerated at the

WCDC from his conviction on September 23, 2008, until his transfer to the Arkansas

Department of Correction on January 9, 2009.   Specifically, Keating alleges that his

constitutional rights were violated when he was: forced to submit to an enema based on

suspicion that he had hidden methamphetamine in his rectum; placed in disciplinary segregation

without Due Process; subjected to unconstitutional conditions of confinement while in

segregation; and his mail was interfered with on three occasions.  He names as Defendants Major

-1-

Randall Denzer, Sheriff Tim Helder, Corporal Nathan Matthews, Deputy Cody Stout, Nurse Shirley Moss, Sergeant Misty Charles, Sergeant Michael Cambron, Sergeant J. Fuller, Sergeant S. Brewer, Corporal T. Muggy, Sergeant Schmidt, Deputy Whitehouse, Deputy Dobbs, Deputy Hurley, Deputy Sharp, Deputy East, Lieutenant Mason, Deputy Brad Morgan, and Deputy Chad Morgan, all in their individual and official capacities.  On October 6, 2010, an evidentiary hearing was held and, at the conclusion of the hearing, the case was taken under advisement pending issuance of this report and recommendation.

## I.  EVIDENCE PRESENTED

### A.  Keating's Claim Regarding Forced Submission to an Enema

#### Defendants' Version of Events

Defendants' version of events leading up to Keating being administered an enema and subsequently being placed in disciplinary segregation are detailed in incident reports prepared by Deputy William Hurley, Lieutenant Sabrina Mason, and Detective Steven Hulsey.  (Defs.' Exs. 2, 24.)  These individuals also testified at the evidentiary hearing, as did WCDC Nurse Shirley Moss and WCDC Deputies Bruce Strain and Leslie Reese.  According to the incident reports and testimony of these witnesses, the following events took place on June 24, 2008.

At approximately 8:30 a.m., inmate Terry Lankford, a WCDC trustee, advised Deputy Hurley that inmate Jeremy Reynolds was acting extremely erratic.  Deputy Hurley responded that Reynolds appeared to be on "some kind of drug," and Lankford then informed Deputy Hurley that there was methamphetamine in S-Block.  Reynolds was placed in a restraint chair for his safety and Deputy Hurley explained to him that he was worried Reynolds "may have taken something that could cause him physical harm."  (Defs.' Ex. 2.)  Reynolds then agreed to take a drug test and was released from the restraint chair so that he could do so.  When the test came back positive for

methamphetamine, Deputy Hurley explained to Reynolds that "any cooperation would be greatly appreciated," and Reynolds then advised Deputy Hurley that Keating had methamphetamine concealed in his rectum and "was taking small quantities out and sharing it with other detainee[]s in the block." (Id.)    Reynolds also informed Deputy Hurley that inmates were hiding the methamphetamine in toilet paper rolls and in books; however, the only inmate Reynolds could identify as having done this was inmate Paul Storms.

Deputy Hurley then spoke with inmate Storms, who informed him that inmates were snorting methamphetamine off of a blue book with a piece of paper rolled up like a straw.  When Deputy Hurley asked Storms how the methamphetamine was getting into the facility, he stated that Keating had concealed the methamphetamine in his rectum when he had booked into the facility and that Keating was also "having it snuck [in] . . . through mail." (Id.)  When Deputy Hurley confronted Keating about the matter, Keating refused to take a drug test, became very agitated, and asked to speak with his attorney.

WCDC Nurse Shirley Moss testified that Keating was brought to the nurse's station to determine what could be done to determine if he had methamphetamine in his rectum.  Nurse Moss felt that there was a medical need for Keating to be taken to the hospital and she completed a medical transport sheet, stating in the "medical complaint" section, "possible drugs in anus." (Defs.' Ex. 4.) Deputies Strain and Reese testified that they were the transport officers who took Keating to the hospital (Defs.' Ex. 25), but they simply provided the medical transport sheet to the hospital medical staff and made no suggestions as to what procedures were to be performed on Keating.  The deputies testified that, according to WCDC policy, they maintained contact with Keating at all times while he was at the hospital.  The "treatment" section of the medical transport

-3-

sheet, completed by Dr. David Dias, the emergency room attending physician, states: "KUB[1] to check for foreign body, followed by enema.  Results are normal stool [without] evidence of foreign material."  (Defs.' Ex. 4.)

Dr. David Dias was the attending doctor for the duration of Keating's stay in the emergency room on June 24th.  When it is suspected that a foreign body is present in the rectum, Dr. Dias testified that it is standard protocol to perform both an x-ray and an enema.  He indicated an x-ray alone would not reveal the presence of a plastic or balloon container in the rectum.  He testified the presence of drugs, such as methamphetamine, in the rectum can result in serious, and even life threatening, medical problems.

In Keating's case, Dr. Dias testified he ordered the procedures without input from detention center personnel.  In his mind, patient consent was not necessary because of the urgency of the situation.  In Dr. Dias' opinion, waiting until the patient defecated naturally could be dangerous.

**Keating's Testimony**

Keating testified to the following.  After suspicions were raised about him having methamphetamine in the jail and distributing it to other inmates, he offered to defecate in a "dry cell," one with no toilet or running water, to prove he had no hidden drugs.  Keating was taken to a room by Deputy Hurley and another officer and instructed to take off his clothes, squat and cough.  He was not physically touched.  Keating testified that he had been strip-searched on other occasions and did not have a problem with the fact that he was strip-searched on this occasion.

Keating was transported to the hospital by Deputies Strain and Reese.  According to Keating, when he was being checked in, the deputies told medical personnel that he was suspected of having methamphetamine in his rectum and the deputies authorized a rectal

---

[1]A KUB is a diagnostic medical imagining technique of the abdomen.  It stands for Kidneys, Ureters, and Bladder.

examination.  Keating refused to sign the consent for treatment form.  (Defs.' Ex. 6 at pg. 3.)
Keating acknowledged that he heard Dr. Dias order a Fleet enema and that he never heard the
deputies specify that an enema should be administered.  The procedure took only a couple of
minutes and during the procedure, the deputies were present and Keating was shackled to the bed
with his legs spread and his arms cuffed together while he defecated into a bedpan.  Keating
characterized the procedure as more humiliating than anything.  No evidence of drugs or other
foreign materials was found.

**Jeremy Reynolds' Testimony**

Reynolds was incarcerated at the WCDC from May 28, 2008, until August 11, 2008
(Defs.' Ex. 26), during which time period, he and Keating were cell-mates for four or five days.
Reynolds testified that he smuggled in a gram or two of methamphetamine, but no more than an
eight ball (3 ½ grams), when he was booked into the jail.  The methamphetamine was in a baggie
that he swallowed and then vomited back up.  Reynolds kept the drugs in a roll of tissue paper
in his cell.

Reynolds testified that he used the last of the methamphetamine on June 24th, when he
was administered the drug test.  According to Reynolds, after he tested positive for
methamphetamine, the deputies kept trying to get him to say that Keating had given him the
methamphetamine and he eventually said that this was true so that they would let him out of the
restraint chair.  When Reynolds later refused to make a written statement implicating Keating,
he was locked down.

**Paul Storms' Testimony**

Storms was incarcerated at the WCDC from May 24, 2008, to September 2, 2009. (Defs.' Ex. 27.)  Storms testified that he did not know Keating personally but had seen him at the WCDC and shared a cell with him for a few days.

On June 24th, Storms recalled Deputy Hurley questioned him about there being methamphetamine in his and Keating's cell.   Storms told Deputy Hurley he knew methamphetamine was there and identified Keating by description, as he did not know his name, as the inmate in possession of the methamphetamine.   Storms testified that about a week later, he was questioned again by two officers.  Storms informed them that a blond inmate in jail on federal charges  had asked him and another inmate to keep watch for him while he removed methamphetamine from his rectum.  Storms testified that once removed, the methamphetamine was being passed around and shared, although Storms did not take any.  After being shown pictures of inmates Reynolds and Keating (Defs.' Exs. 1, 26) at the evidentiary hearing,  Storms testified that the individual he identified to Deputy Hurley and the other officers was Keating.

Storms denied having told Deputy Hurley that he believed Keating was having methamphetamine smuggled into the facility through the mail. In all other respects, however, Storms testified that Deputy Hurley's incident report was correct.

**B.  Keating's Claim Regarding Being Placed in Disciplinary Segregation Without Due Process**

**Keating's Testimony**

Keating testified that when he was transported back to the WCDC from the hospital on June 24th, he was immediately locked down for ten days (eleven counting June 24th).  Keating

-6-

testified that he was not provided with a disciplinary report, a hearing, or even the opportunity to submit a grievance, nor was he ever notified that he had any right to appeal his lock-down. Keating testified that when he asked why he was being locked down, he was simply told "you know why." Keating testified that he never even knew, until the evidentiary hearing, that his lock-down was allegedly reviewed by a Disciplinary Review Board. Keating testified that he requested grievance forms, but these requests were denied.

**Defendants' Version of Events**

According to incident reports prepared by Lieutenant Mason and Detective Steven Hulsey, Sergeant Misty Charles ordered a "shakedown of S block" on June 24th to search for methamphetamine. During the shakedown, deputies found two greeting cards belonging to Keating with the "front of the greeting cards ... torn off like something had been on them." (Defs.' Ex. 24.) Deputies also seized a card addressed to Keating from his wife that was in the incoming mail. The cards were placed in a box in the squad room and a drug dog alerted on the box. The face of one of the cards appeared to have been cut open and then glued back. Detective Steven Hulsey with the Washington County Sheriff's Office cut the face of the card open and performed a field test on paper shavings inside the card. The shavings tested positive for the presence of methamphetamine.[2]

---

[2] The greeting cards were submitted to the Arkansas State Crime Lab for further testing. The results were not completed until August 18, 2008, and reflected "no controlled substances confirmed (residue)." (Defs.' Ex. 24 at pg. 5.) Detective Hulsey explained that the lab results did not contradict the positive field test and that the term "residue" on the lab results indicated that no actual drugs were found but that there was evidence that the object once contained drugs.

-7-

The undersigned notes that the incident reports prepared by Lieutenant Mason and Detective Hulsey are the only documents indicating that there was any trace of methamphetamine found during the shakedown.  These reports were not submitted in support of the Defendants' summary judgment motion, nor were they submitted as proposed exhibits with the Defendants pretrial information filing (Doc. 55); the reports were added as proposed exhibits the morning of the evidentiary hearing.  When the undersigned inquired about this matter, defense counsel explained that the reports had not been previously located.  As the testimony below reveals, it appears that these reports were not provided to anyone involved in issuing the written disciplinary against Keating or in reviewing the disciplinary.

According to Lieutenant Mason's incident report, when Keating was transported back to the WCDC from the hospital, Captain Osburn authorized locking him down for ten days for "Introducing Contraband in a Controlled Facility."  (Defs.' Ex. 24 at pg. 2.)  However, an incident report and disciplinary report prepared by Corporal Nathan Matthews on June 25, 2008, indicate that Corporal Matthews was the officer who recommended that Keating be locked down.  (Defs.' Exs. 3, 5.)  Corporal Matthews' narrative section of the disciplinary report states: "On 6/24/08 there was a controlled substance found in 'S' block.  There is a[n] ongoing investigation on Detainee Matthew Keating.  There is suspicion of him introducing a controlled substance into the facility.  It is rec[]ommended that he rec[ei]ve ten days until further notified."  (Defs.' Ex. 5) The disciplinary report was witnessed by Deputy Coty Stout, and Sergeant Michael Cambron also signed off on it as the shift-supervisor.

The disciplinary report had a box checked indicating that Keating had been "notified of the right to file a disciplinary appeal in writing to the Disciplinary Review Board."  (Id.)  The only documentation of any action taken by the Review Board is an incident report and a

-8-

document captioned "Disciplinary Review Board Response" dated June 29, 2008, with the simple narrative, "The review board agrees with the recommended 10 days of lock down status." (Defs.' Ex. 7.)  The "Disciplinary Review Board Response" was signed by Board members Sergeant Jeremy Fuller, Sergeant Shane Brewer, and Corporal Tom Muggy.

WCDC's written policy on inmate discipline provides, inter alia:

> 1.b.    Officers shall inform the Jail Administrator <u>in writing</u> whenever disciplinary actions are taken.  Incident reports shall include[] the facts of the offense, the date and time, witness[es]' names, and the officer's [] actions....

> 1.f.    All disciplinary actions shall be reviewed by the facility administrator and an informal hearing conducted in accordance with this section if the situation warrants....

> 6.a.    Any disciplinary action taken by an officer against a detainee shall be reviewed by the shift supervisor.  If the detainee wants to appeal, he/she shall appeal to the jail lieutenant.  If the action(s) of the jail lieutenant are unsatisfactory to the detainee, he/she may appeal to the jail captain.  If that appeal is not satisfactory to the detainee, an appeal may be taken to the Sheriff for review.

(Defs.' Ex. 20.)

Major Randall Denzer, the jail administrator, testified that the written disciplinary policy did not accurately reflect what was being done in practice at the WCDC.  For instance, Major Denzer acknowledged that while he was notified a day or two after the incident about Keating's disciplinary and was provided with Deputy Hurley's incident report, he did not recall seeing the actual disciplinary report prepared by Corporal Matthews.  Major Denzer further acknowledged that while the written policy provided for a review by the facility administrator and an informal hearing, in practice, the informal hearing was a review conducted by a Disciplinary Review Board.  Major Denzer testified that Corporal Matthews should have advised Keating about the

basis for the disciplinary, as deputies were trained to go back to the cell and notify the inmate; however, the shift-supervisor was ultimately responsible for ensuring inmates were aware of their right to appeal. Major Denzer testified that while the written policy provided for an "appeal," the grievance procedure was the actual route through which an inmate could challenge his disciplinary and inmates in lock-down could ask for a grievance form during their hour out of their cells each day.

Corporal Matthews testified that he did not recall who gave the order to place Keating in disciplinary segregation and that the events at issue on June 24th occurred before he was on duty. Corporal Matthews acknowledged that he, therefore, had no personal knowledge of the events and only knew what he had been told during a briefing at the start of his shift. Corporal Matthews testified that despite his lack of personal knowledge of the events at issue, he prepared the disciplinary report recommending that Keating be locked down because he was instructed to do so. Corporal Matthews acknowledged that his disciplinary report did not comply with WCDC's written policy on inmate discipline, as it did not include any names of witnesses to the events, did not explain the facts forming the basis for the suspicion that Keating had introduced methamphetamine into the facility, and Corporal Matthews could not say if the disciplinary report was forwarded to the jail administrator.

With regard to advising an inmate about the basis for a disciplinary and his appeal rights, Corporal Matthews testified that when a disciplinary report is written and an inmate is locked down, the inmate is verbally advised of the reasons for the lock-down, but is not provided anything in writing. Corporal Matthews initially testified that either he or Deputy Stout would have verbally advised Keating of the reason for the lock-down – suspicion of introducing

-10-

methamphetamine into the facility – but Corporal Matthews then acknowledged that he had no recollection of talking to Keating about the disciplinary or his right to appeal.

Sergeant Cambron, who signed off on the disciplinary report as the shift-supervisor, testified that he was not sure who would have advised Keating about the basis for the disciplinary, although it is usually done by the officer who puts the inmate in segregation and Sergeant Cambron did not know who put Keating into the lock-down cell.  According to Sergeant Cambron, all inmates "pretty much" know about the right to appeal because the same form that is used for grievances, requests, and medical complaints also has a box that can be checked for a "disciplinary appeal."  (See, e.g. Defs. Ex. 12.)

Brandon Whitehouse, a deputy at the WCDC from June 2005 through September 2008, testified that he could not recall any inmates being informed of the right to appeal and was not sure that inmates even had appeal rights.  According to Whitehouse, when he wrote disciplinary reports and locked inmates down, he assumed "that was it," and he simply passed the disciplinary reports on to his supervisor and did not know what happened after that.  Whitehouse testified that if an inmate disagreed with any action taken, he could obtain a grievance form from an officer and submit a grievance about the matter.

With regard to the appeal process itself, Corporal Matthews testified that inmates were required to appeal a disciplinary in writing by requesting one of the forms mentioned above and writing out his statement regarding what occurred.  The form would then go to the shift-supervisor and, from there, Corporal Matthews believed it went to the Review Board.  Corporal Matthews testified that it was up to the Review Board to decide whether to give an inmate the opportunity to appear before them and tell his side of the story.   According to Corporal Matthews, regardless of whether an inmate appeals a disciplinary, the Review Board should

-11-

review any disciplinary lock-down the following day after the lock-down is ordered. Corporal Matthews could not explain why the Review Board did not review Keating's lock-down until June 29th, after Keating had already been in lock-down for six days.

Corporal Matthews testified that Sergeant Cambron, as the shift-supervisor, should have been the one to make sure that the disciplinary report was submitted to the Review Board. Sergeant Cambron testified that after he signed off on the disciplinary report, he placed it in a box in the office for the next shift to handle. However, as explained by Sergeant Lori Schmidt Wilson, the next shift to come on that had nothing to do with the events at issue would perform the disciplinary review. Sergeant Wilson explained that both the day shift and the night shift were involved in the investigation and disciplinary report issued against Keating and that Keating, therefore, had to wait until the next shift rotation occurred for the review.[3]

Sergeant Brewer testified that when he came back on duty the Wednesday or Thursday following the June 24th incident, he was briefed about the drug dog alerting on Keating's greeting cards and he knew Keating was on lock-down, but he did not think about the disciplinary and would have assumed that the day shift had already performed the review. Sergeant Brewer testified that he did not find the disciplinary report until several days after it had been issued, and that the review was performed the very day that the report was found. Sergeant Brewer explained that the Review Board process was fairly new at that time and it was designed to ensure that a neutral decision-maker reviewed the initial lock-down to determine whether it was justified. Sergeant Brewer testified that he never had an inmate present for a review, but that an

---

[3]According to Major Denzer, a rotation of deputies worked Sunday through Tuesday, then another rotation of deputies worked Thursday through Saturday, with the rotations alternating Wednesdays.

inmate could write down his side of the story and this would be passed on to the Review Board to consider.

According to Sergeant Brewer and Corporal Muggy, who also served on the Review Board, before the Board affirmed the decision to lock Keating down, it had reviewed Deputy Hurley's incident report and Corporal Matthews' disciplinary report and had been briefed that a dog had alerted on Keating's mail and that residue on cards belonging to Keating had field-tested positive for methamphetamine. Sergeant Fuller, the third member of the Review Board, acknowledged that Corporal Matthews' disciplinary report shed no light on the events at issue; that the Review Board had not been advised as to whether or not methamphetamine had been found on Keating's person at the hospital; and that, while the Review Board had been briefed about the residue on Keating's cards, they had not actually seen Lieutenant Mason's and Detective Hulsey's reports (Defs.' Ex. 24) detailing this fact or any other documentation indicating that methamphetamine was actually found. Sergeant Fuller further acknowledged that the Review Board did not conduct a thorough investigation and that the review was performed long after the fact.

## C. Keating's Claim Regarding Conditions of Confinement in Disciplinary Segregation

Keating testified that during the eleven-day period that he was in disciplinary segregation, he was denied commissary and visitation privileges and reading and writing materials, and, other than being given one hour a day to go into the day-room and to take a shower, he was locked-down in his cell twenty-three hours of the day. According to Keating, his cell had a toilet/sink combination and a steel bunk, for which he did not have a mat four out of the eleven nights. Keating testified that he also did not have a blanket and that his cell was cold and he only had

-13-

his jumpsuit for warmth.  Keating testified that on one occasion he wore his socks on his arms to keep them warm, but Deputy Charles Dobbs took them away.  According to Keating, he only saw the deputies when it was meal time or shower time, and his requests for a mat, blanket and grievance forms were denied by Deputy Dobbs, Deputy Whitehouse and Sergeant Cambron.

Former WCDC inmate Jeremy Reynolds testified that while on lock-down, inmates were locked in their cells twenty-three hours a day and that, during their one hour out of their cells, inmates could go into a general day area that had tables and a phone.  According to Reynolds, no writing materials were allowed in the cell, but an inmate could ask a guard for writing materials while out in the day-room.  Reynolds testified that as long as an inmate was not on suicide watch, he would receive a mat to sleep on each night.

According to the WCDC Defendants, an inmate in disciplinary segregation receives an hour out of his cell each day, during which time he can request grievance forms, can write personal or legal letters, and can use the phone.  Mats and blankets are provided by 9:00 p.m. and collected at 5:00 a.m.  Jail standards require that the WCDC be kept between sixty-five and eight-five degrees.

### D.  Keating's Claim Regarding Interference with his Mail on Three Occasions

Keating testified that the card addressed to him that was seized from the incoming mail on June 24, 2008, was never delivered to him, and that he also never received mail addressed to him on November 3, 2008, and December 29, 2008.  Keating testified that there was no evidence that methamphetamine was ever found in his mail.  Keating acknowledged that he was not aware, prior to the evidentiary hearing, that the card seized on June 24th had field tested positive for the presence of methamphetamine.

Corporal Brian Roy testified that officers had been briefed to watch for contraband in mail sent to Keating, as there had been a prior incident in which his incoming mail contained methamphetamine. An incident report prepared by Corporal Roy on November 3, 2008, reflects that while sorting incoming mail for the pods on this date, he noticed two letters addressed to Keating and noticed that neither letter had a return address. Corporal Roy took the letters to Corporal Joe Smith to have his dog, trained in drug detection, check the letters. The dog "hit on the letters," indicating that the letters "had drugs inside." Corporal Roy, therefore, "submitted the letters into evidence so they could be sent to the crime lab to be tested for drugs." (Defs.' Ex. 9.) Corporal Roy testified that he did not know if the letters were ever given to Keating, and there is no evidence indicating what happened to the letters after they were submitted "into evidence" nor any evidence indicating whether any lab tests were actually performed to test the letters for the presence of drugs.

On December 29, 2008, Corporal Doyle Sharp and Corporal Kevin East prepared incident reports (Defs.' Exs. 10, 11) indicating that while passing out mail on this date, they noticed three letters addressed to Keating. Corporal East placed the letters in his pocket to be searched by the shift-sergeants, as the sergeants had been "checking Mr. Keating's mail for the past 7-8 weeks since meth was twice found in his incoming mail" (Defs.' Ex. 10). Corporal Sharp took the letters to the sergeant's office and delivered the letters to Keating approximately twenty minutes later, after Sergeant Jeremy Fuller searched the letters and made sure they did not contain contraband.

## II. DISCUSSION

As noted above, Keating asserts the following four claims: (1) he was forced to submit to an enema based on suspicion that he had hidden methamphetamine in his rectum; (2) he was

-15-

placed in disciplinary segregation without Due Process; (3) he was subjected to unconstitutional conditions of confinement while in segregation; and (4) his mail was interfered with on three occasions.  I will address each claim in turn.

However, first it should be noted that at the evidentiary hearing, Keating indicated that he was no longer pursuing claims against the following Defendants:  Coty Stout; Shirley Moss; Misty Charles; Brandon Whitehouse; Charles Dobbs; Brad Morgan; Chad Morgan; and Lori Schmidt Wilson.[4]  Therefore, all claims against these individuals should be dismissed.

**A.  Keating's Claim Regarding Forced Submission to an Enema**

The Fourth Amendment prohibits unreasonable searches.  Bell v. Wolfish, 441 U.S. 520, 558 (1979).  In Bell, the Supreme Court upheld a detention facility's policy of conducting visual body cavity searches of all pretrial detainees after contact visits.  Id., 441 U.S. at 560.  In doing so, the Court considered the justification for initiating the search and the scope, manner, and place of the search.  Id., 441 U.S. at 559.  The Court concluded that legitimate security concerns of the officials in preventing the introduction of contraband into the facility outweighed the intrusiveness of the search.  Id. The search must be reasonable and not motivated by punitive intent.  Id., at 558-61.

---

[4]It is often difficult in a pro se action such as this one for the Plaintiff to identify the actual individuals involved in the alleged constitutional violations, as the Plaintiff is an inmate and all records identifying the deputies allegedly involved – such as logs and incident reports – are in the Defendants' possession.  Many of the individuals with possible involvement in the constitutional violations alleged by Keating were not identified until the filing of the Defendants' summary judgment motion.  After the summary judgment motion was denied, the undersigned directed service of Keating's complaint upon these individuals, anticipating that the Defendants would move to dismiss any individuals not actually involved in the alleged violations.  Defense counsel, however, failed to file such a motion, resulting in it being necessary to have all Defendants present for the evidentiary hearing.

-16-

In this case, Keating does not challenge the constitutionality of the strip-search done at the WCDC. Instead, he maintains the non-consensual administration of the enema at the hospital violated his rights. The medical procedures were done at the hospital by medical personnel. The testimony of Dr. Dias is undisputed that he is the one who ordered the medical procedures including the enema. Dr. Dias had no input from any of the Defendants in determining what medical procedures should be done. Instead, Defendants only communicated that there was a suspicion that Keating had methamphetamine in his rectum.

I believe the evidence clearly establishes that there were legitimate security and safety concerns motivating the decision to take Keating to the hospital. Cf. Franklin v. Lockhart, 883 F.2d 654, 655-56 (8th Cir. 1989)(Legitimate security concerns justified conducting strip searches of inmates in segregation in view of other inmates); Goff v. Nix, 803 F.2d 358, 370-71 (8th Cir. 1986)(Visual body cavity search of segregation unit inmates before and after going to exercise area to prevent passage of contraband was constitutional). As outlined above, inmate Reynolds, who tested positive for methamphetamine, identified Keating as the source of the drug. The undersigned does not find credible Reynolds' testimony that he only implicated Keating because deputies were pressuring him to do so and he wanted to be released from the restraint chair. Inmate Storms also identified Keating as having been in possession of methamphetamine and indicated that Keating had the methamphetamine in his rectum. According to Dr. Dias, the presence of methamphetamine in the rectum could have serious health consequences and possibly even lead to death. Under these circumstances, I do not believe an unreasonable search occurred or that Defendants dictated in anyway the medical procedures to be taken.

-17-

**B.  Keating's Claim Regarding Being Placed in Disciplinary Segregation Without Due Process**

Under the Due Process Clause of the United States Constitution, a pretrial detainee may not be punished prior to an adjudication of guilt.  See Bell, 441 U.S. at 535.  He "cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less."  Higgs v. Carver, 286 F.3d 437, 438 (7th Cir. 2002).

"The Supreme Court has outlined the procedures correctional facilities must follow to conduct an impartial due process hearing on a disciplinary matter."  Hartsfield v. Nichols, 511 F.3d 826, 830 (8th Cir. 2008)(citing Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974)).  These procedures include written notice of the charges, a brief period to prepare, a written statement of the evidence relied on and reasons for the disciplinary action, and the ability for the inmate to call witnesses and present documentary evidence.  Id; see also Dible v. Scholl, 506 F.3d 1106, 1110 (8th Cir. 2007).

An impartial disciplinary committee may find a detainee guilty if it finds some evidence upon which to base the disciplinary violation.  Hartsfield, 511 F.3d at 831.  In fact, the Eighth Circuit has noted that

> disciplinary actions may be taken–and often they are–based *only on a guard's report.  Even when there is substantial evidence to the contrary, the committee may find a guard's report to be credible* and therefore take disciplinary action.  However, the *Wolff* hearing ensures that the inmate has an opportunity to persuade an impartial decisionmaker, who must give written justification for his decision, that discipline is not warranted.  This is the interest protected by the Constitution.

Hartsfield, 511 F.3d at 831 (quoting Hrbek v. Nix, 12 F.3d 777, 781 (8th Cir. 1993)).

-18-

In this case, Keating was clearly not afforded Due Process in connection with his disciplinary confinement beginning on June 24th. The undisputed evidence establishes that Keating was not provided with written notice of the disciplinary charge, or a written statement of the evidence relied on and reasons for the disciplinary action, the opportunity to tell his side of the story, or the ability to call witnesses and present documentary evidence.

To establish personal liability of the supervisory Defendants, Sheriff Helder and Major Denzer, "requires a causal link to, and direct responsibility for, the deprivation of rights." Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007)(internal quotation marks and citation omitted). "[G]eneral responsibility for supervising the operations of a prison is insufficient to establish personal involvement." Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987). In this case, Sheriff Helder had no personal involvement in the decision to lock Keating down or with the review of the lock down. Major Denzer, however, was notified about Keating's disciplinary and was provided with Deputy Hurley's report. Major Denzer testified that although the jail policy provided for him to be notified in writing whenever disciplinary actions were taken, he did not recall seeing the actual disciplinary report. Major Denzer did nothing to ensure the disciplinary policy was followed or that Keating received Due Process in connection with the lock down. This is sufficient to establish his personal liability for the Due Process violation.

The official capacity claims against Sheriff Helder and Major Denzer are the equivalent of a claim directly against Washington County. See e.g., Bankhead v. Knickrehm, 360 F.3d 839, 844 (2004). It is undisputed that Sheriff Helder established County policy with respect to the care and custody of prisoners. Ark. Code Ann. § 12-41-502 (2010)("The county sheriff of each

-19-

county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her custody, and he or she may appoint a jailer for whose conduct he or she shall be responsible").

The Supreme Court has held that a governmental entity can be held liable under § 1983 if an "action pursuant to official [government] policy [or a widespread custom or practice] of some nature caused a constitutional tort."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); see also Marksmeier v. Davie, 622 F.3d 896, 902 (8th Cir. 2010).  To establish Washington County's liability, Keating must first show that one or more of the WCDC's officers violated his Due Process rights.  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  As discussed above, Keating met this requirement.  Second, Keating "must establish the requisite degree of fault on the part of the [governmental entity] and a causal link between [the] policy [practice or custom] and the violation.  Such a showing requires either the existence of a . . . policy that violates federal law on its face or evidence that the [governmental entity] has acted with deliberate indifference to an individual's federal rights."  Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010)(internal quotation marks and citations omitted).

I believe Keating has established that the WCDC, in practice, was deliberately indifferent to detainee's constitutional rights by failing to train its officers with respect to the Due Process rights of detainees.  The evidence establishes the WCDC disciplinary policy was not followed in practice.  While various safeguards were contained within the written policy to ensure the rights of detainees, the officers clearly received insufficient training in this regard.  Connick v. Thompson, No. 09-571, 2011 WL 1119022 (U.S. 3/29/2011)("[A] municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons

-20-

with whom the [untrained employees] come into contact"); <u>Board of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 409 (1997)(not foreclosing the possibility that even a single violation may lead to governmental liability where the entity "has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation").  "The need for training is obvious if the employee's violation involved a clear constitutional duty, such that there were clear constitutional guideposts for [the governmental entity]." <u>Veatch</u>, 627 F.3d at 1258.  The Due Process requirements in the context of disciplinary actions are clear. <u>See Wolff</u>, 418 U.S. at 563-66.  Accordingly, I conclude that Keating has established the failure of Washington County to train its detention center personnel with respect to the disciplinary policy and the Due Process rights of detainees amounted to deliberate indifference to Keating's rights.

With regard to the liability of the other Defendants involved with the issuance or review of the disciplinary, Corporal Matthews wrote the disciplinary report despite the fact that he had no personal knowledge regarding the incident and his report does not include the facts of the offense, the date and time, or witnesses' names, and a written copy was not provided to the jail administrator.  (Defs.' Ex. 20 at 1.b).  Further, Matthews had no recollection of talking to Keating about his right to appeal.  Whitehouse testified he could not recall any inmates being informed of the right to appeal and was not even sure inmates had a right to appeal.

Despite the fact that it clearly did not comply with the requirements of the disciplinary policy, the incident report was signed off on by shift-supervisor, Sergeant Cambron.  As noted above, Major Denzer did not recall seeing the report.  The Review Board, Sergeant Fuller, Sergeant Brewer, and Corporal Muggy, did not review the lock down until June 29th despite the fact that Keating had been locked down on June 24th.  Major Denzer testified it was routine for

-21-

detainees to have to wait three or four days into their lock down for the Review Board to meet. Major Denzer conceded that in Keating's case there was not sufficient information to lock him down and that a mistake was made when a Review Board did not review the lock down until six days into it.

Corporal Matthews, Sergeant Cambron, Sergeant Fuller, Sergeant Brewer, and Corporal Muggy were all directly and personally involved in the issuance or review of the disciplinary. Their liability in their personal capacities for the Due Process violation is clear.

The issue then becomes what relief Keating should be awarded on his Due Process claim. Compensatory damages under § 1983 are governed by general tort-law compensation theory. See Carey v. Piphus, 435 U.S. 247, 255 (1978). In Carey, the Supreme Court noted that damages are available under § 1983 for actions "found . . . to have been violative of . . . constitutional rights and to have caused compensable injury." Id. (internal quotation marks and citations omitted). The law generally provides that damages may be awarded for injuries such as mental anguish and suffering, personal humiliation, and monetary losses. Memphis Community School Dist. v. Stachura, 477 U.S. 299, 307 (1986)(citations omitted). However, damages may not be awarded for the abstract or subjective value of the constitutional right at issue. Id, 477 U.S. at 308; Carey, 435 U.S. at 248.

The generally applicable rules have been altered when it comes to civil rights actions brought by prisoners. Codified as 42 U.S.C. § 1997e(e), section 803(d) of the Prison Litigation Reform Act of 1996 (PLRA) provides as follows: "No Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." See also Royal v.

-22-

Kautzky, 375 F.3d 720, 723 (8th Cir. 2004)(the physical injury requirement of the PLRA "limit[ed] recovery for mental or emotional injury in all federal actions brought by prisoners."). Section 1997e(e), however, does not bar the recovery of other types of relief such as nominal damages, punitive damages, and injunctive and declaratory relief. Id.

Clearly, no physical injury resulted from the Due Process violation. Keating's damages are therefore limited by the PLRA to nominal and punitive damages. In cases where it was found an inmate's constitutional rights were violated by improper confinement to administrative segregation or solitary confinement, the courts have found it appropriate to rely on a per day amount in assessing damages. See e.g., Stevens v. McHan, 3 F.3d 1204, 1207 (8th Cir. 1993). I believe it is an appropriate method to award him nominal damages on a per day basis. Accordingly, I will recommend that Keating be awarded nominal damages in the amount of $1 per day for each day he was confined to segregation following the incident on June 24, 2008. Testimony indicates Keating was placed in segregation on June 24th and remained there for ten additional days for a total of eleven days.

With regard to punitive damages, punitive damages may be awarded at the discretion of the fact-finder once sufficiently serious misconduct by one or more of the Defendants is shown to exist. Smith v. Wade, 461 U.S. 30, 52 (1983). The purpose of punitive damages is to punish the Defendants and/or deter similar conduct in the future. See Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 19-20 (1991). In § 1983 cases, it has been said that punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."

-23-

<u>Walters v. Grossheim</u>, 990 F.2d 381, 385 (8th Cir. 1993)(internal quotation marks and citation omitted).

Having given careful consideration to the testimony elicited at the evidentiary hearing, I conclude Keating is not entitled to an award of punitive damages.   Although I concluded Keating was not given the minimal Due Process procedures required when he was placed on lock-down, I do not believe the evidence elicited shows the conduct was motivated by evil motive or intent or involved reckless or callous indifference to Keating's federally protected rights.  At most, the evidence established that the Defendants, in reacting to the existence of methamphetamine in the jail, failed to take appropriate steps to ensure Keating received Due Process in connection with his lock-down.

## C.  Keating's Claim Regarding Conditions of Confinement in Disciplinary Segregation

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." <u>County of Sacramento v. Lewis,</u> 523 U.S. 833 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  <u>See Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994).

In this circuit, the deliberate indifference standard of the Eighth Amendment is applied to all conditions of confinement claims whether the claims are brought by a pretrial detainee or a convicted prisoner.   <u>See Butler v. Fletcher</u>, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc.);<u>Hall v. Dalton</u>, 34 F.3d 648, 650 (8th Cir. 1994)("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment

-24-

claims have been the same.").  The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII.  The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities."  Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996).  Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities.

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element.  See Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004)(citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner"  Revels, 382 F.3d at 875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety."  Id.  The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).

Keeping these principles in mind, I turn to an examination of the conditions of confinement alleged to exist in this case.  In this case, Keating maintains the conditions in the segregation cell were unconstitutional.  He testified that the cell contained only a toilet/sink combination and a steel bunk.  He indicated that he had no mat for four of the days he was segregated, no blanket, no writing materials, no reading materials, no commissary visits, no

-25-

visitation, and the cell was cold.  He received an hour out of the cell each day, during which time he could shower, use the phone, obtain paper and pencils or grievance forms, or exercise.

Defendants offered testimony that mats and blankets were passed out each evening and collected in the morning.  The testimony offered indicates the temperature of the jail was kept between 65 and 85 degrees.  While the conditions Keating was subjected to may not have been pleasant, the evidence does not establish that he was deprived of a single identifiable human need.  See e.g.,  Skelton v. Bruce, 2010 WL 4342301, *4 (10th Cir. Nov. 3, 2010)(in considering inadequate heating claim, the court must consider the severity of the temperature, its duration, and whether the inmate had adequate alternatives to protect himself from cold);  Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003)(no contact visitation, no exercise privileges, and limitations on religious services for thirty-seven days not violate the constitution); Goldman v. Forbus, 17 Fed. Appx. 487, 488 (8th Cir. 2001)(no constitutional violation where detainee slept six nights on floor next to toilet); Dixon v. Godinez,, 114 F.3d 640, 644 (7th Cir. 1997)("[J]ust because low temperature forces a prisoner to bundle up in a coat and blanket does not necessarily mean that prison conditions violate the Eighth Amendment");  Tokar v. Armontrout, 97 F.3d 1078, 1083 (8th Cir. 1996)("[W]e note that we know of no constitutional right of access to a prison gift or snack shop");  Williams v. Delo, 49 F.3d 442, 444-46 (8th Cir. 1995)(placement in strip cell without water or a mattress for four days did not violate Eighth amendment); Zain v. McCormick, 2011 WL 1100171, *5 (W.D. Ky. March 22, 2011)(no federal constitutional right to commissary access); Laratta v. Brown, 2011 WL 1060208, *10 (D. Colo. March 2, 2011)(right of access to newspapers, magazines, and other publications can be reasonably restricted so that the right is considerably less for inmates in disciplinary segregation).

-26-

### D.  Keating's Claim Regarding Interference with his Mail on Three Occasions

Inmates have a First Amendment right of free speech to send and receive mail.  Hudson v. Palmer, 468 U.S. 517, 547 (1984).  "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment."  Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 125 (1977). Restrictions on this First Amendment right are valid "only if reasonably related to legitimate penological interests."  Turner v. Safely, 482 U.S. 78, 89 (1987).

Here, Keating maintains that he never received certain items of personal mail after they were inspected for contraband. In particular, the evidence established the following with respect to Keating's mail: two cards were taken on June 24, 2008, a drug dog alerted on them, the cards field tested positive for methamphetamine and were sent to the crime laboratory for testing; two letters were taken on November 3, 2008, a drug dog alerted and the letters were submitted into evidence to be sent to the crime laboratory for testing, but there is no evidence indicating what happened to the letters after they were submitted into evidence; and on December 29, 2008, four letters were taken to be examined for contraband. Keating maintains that he never received the letters seized on December 29th.

Keating has not suggested there was any ongoing practice of censorship or that the application of any policy resulted in the alleged interference.  He has identified only three incidents of alleged mail interference from June to December of 2008.  With respect to both the first and second incidents, a drug dog alerted on the mail and it was seized and was designated as evidence to be sent to the crime laboratory for analysis at the crime laboratory.  This cannot be said to have violated Keating's First Amendment rights.  See Bumgarner v. Bloodworth, 768

-27-

F.2d 297, 301 (8th Cir. 1985)(intruding into prisoner's personal mail for security reasons is constitutional). From the record, it does not appear the items seized on November 3rd were ever analyzed.

With respect to the December 29th incident, I find credible the testimony of Corporal East and Corporal Sharp that the mail was taken to a sergeant to be examined for contraband and then given to Keating. In any event, even if Keating never received the mail from December 29th, I believe the evidence is simply insufficient to establish a violation of his First Amendment rights. The alleged interference was sporadic and on at least two of the occasions there was reason to believe the items contained methamphetamine. Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003)(Plaintiff must show regular and unjustifiable interference-- an isolated incident of mail tampering is usually insufficient to establish a constitutional violation); Zimmerman v. Tribble, 226 F. 3d 568, 572 (7th Cir. 2000)(allegations of sporadic and short-term delays and disruptions are insufficient to state a claim under the First Amendment); Rowe v. Shake, 196 F.3d 778, 782-783 (7th Cir. 1999)(relatively short-term and sporadic delays in receiving mail not the result of content-based prison regulation or practice is insufficient to state a First Amendment claim).

### III. CONCLUSION

For the reasons stated, I recommend as follows: (1) all claims against the following Defendants be dismissed at Keating's request: Coty Stout; Shirley Moss; Misty Charles; Brandon Whitehouse; Charles Dobbs; Brad Morgan; Chad Morgan; and Lori Schmidt Wilson; (2) Defendants be granted judgment on the unreasonable search, unconstitutional conditions of confinement, and interference with mail claims; (3) Keating be granted judgment on the Due

Process claim and an award of $11 in nominal damages be imposed against Defendants Sheriff Helder and Major Denzer in their official capacities and against Major Denzer, Corporal Matthews, Sergeant Cambron, Sergeant Fuller, Sergeant Brewer, and Corporal Muggy in their personal capacities;  (4) Defendants be required to pay the court filing fee of $350 (Doc. 4) that has been assessed against Keating.  If all or any portion of the filing fee has been paid through deductions from Keating's inmate account, the Clerk should be instructed to refund the funds to Keating; and (5) all claims against Defendants Deputy Hurley, Deputy Sharp, Deputy East and Lieutenant Mason should be dismissed.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of April 2011.

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-29-